UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

CAROL A. RICE-PETERSON,

              Plaintiff,                            Case No. 11-14565
                                                        Honorable Thomas L. Ludington

v.

UNUM LIFE INSURANCE COMPANY
OF AMERICA,

              Defendant.

_____/

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO AFFIRM ERISA
DETERMINATION, DENYING PLAINTIFF'S MOTION TO REVERSE**

      Plaintiff Carol Rice-Peterson's chiropractor determined that she is disabled and can't work. Three board-certified physicians, among others, maintain the opposite conclusion. After determining, like all but Plaintiff's chiropractor, that she is not disabled, Defendant UNUM Life Insurance Company of America denied her application for long-term-disability benefits. In response, Plaintiff filed this lawsuit pursuant to the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001, *et seq*.

      The evidence supports the conclusion that Plaintiff is not disabled. The Plan Administrator's decision to deny benefits will be affirmed, Defendant's motion to affirm will be granted, and Plaintiff's motion to reverse will be denied.

**I**

      Plaintiff seeks long-term-disability benefits under a Group Long Term Disability policy (the Plan) issued by Defendant to Plaintiff's former employer. Plaintiff believes she is disabled, cannot perform her job due to that disability, and therefore Defendant owes her benefits under the Plan.

Prior to filing this claim, Plaintiff worked for Holy Cross Children's Services as a Treatment Specialist II.[1]   The job involves supervising youth in daily activities using the "Agency's Group Model as a basis for change."   Admin. R. 72, ECF No. 24.   According to Plaintiff, she took care of teen mothers and their babies.   *Id*. at 280.   The job requires the capacity to drive, "[p]hysical mobility," and the "ability to stand and/or walk during scheduled shifts; to frequently lift, carry and/or push 25 pounds; to occasionally lift, carry and/or push up to 100 pounds, and to bend, reach, stretch, twist, turn, climb, kneel, crouch, grasp, and crawl."   *Id*. at 72.

Defendant issued the Plan to the Michigan Catholic Conference, which in turn made it available to Holy Cross Children's Services employees like Plaintiff.   Under the Plan, disabled employees are entitled to specific benefits payments.   An employee is disabled "when [Defendant] determines that:

- You are **limited** from performing the **material and substantial duties** of your **regular occupation** due to your **sickness** or **injury**; and
- You have a 20% or more loss in your **indexed monthly earnings** due to the same sickness or injury.

*Id*. at 223 (emphasis in original).   The Plan also notes employees may be required "to be examined by a physician, other medical practitioner or vocational expert of [Defendant's] choice."   *Id*.

Plaintiff's alleged disability — chronic back, shoulder, neck, and foot pain — began on January 17, 2006 when she was involved in a car accident.   That day, Plaintiff and four coworkers were riding in an SUV on the way to off-site training.   The car hit black ice and left the road.   Plaintiff, riding in the back unrestrained, was thrown about the car injuring her neck,

---

[1] Although Plaintiff was employed by Holy Cross Children's Services, her insurance was issued by Defendant to Michigan Catholic Conference, which apparently made insurance available to Holy Cross Children's Services employees.

back, shoulder, and feet.  She was taken to a hospital but released that day when it was determined she had escaped serious injury.  Plaintiff then received the remainder of the week off, and returned to her job the following Monday.

Although she continued to work, Plaintiff maintains she continued to suffer.  She visited her Chiropractor, Dr. Craig B. Denholm, shortly after the accident.  He took an x-ray and performed manipulations which "did help" Plaintiff's pain.  Pl.'s Mot. Ex. 2, at 1, ECF No. 20. Plaintiff visited Dr. Denholm for six months, and then saw a family nurse practitioner "[w]hen there was no improvement."  *Id.*  The nurse practitioner Plaintiff saw was Gerry Gertiser, NP. Mr. Gertiser ordered MRIs and x-rays to evaluate Plaintiff's condition, which were taken on September 19 and 20, 2006.  An MRI of Plaintiff's left shoulder indicated "[m]inimal degenerative changes," while x-rays revealed "[m]ild degenerative changes in the lower lumbar spine."  Pl.'s Mot. Ex. 3, at 2.  Mr. Gertiser then referred Plaintiff to Michigan Spine & Pain for additional treatment.

On March 15, 2007, Plaintiff visited Michigan Spine & Pain, complaining of continued low back and left shoulder pain.  *Id.*  Testing revealed the following:

> Range of motion of the cervical spine was without limitation and only mildly uncomfortable with right side bending.  Range of motion to the lumbar spine was also without limitation and with no complaint of pain, only "tightness."  Range of motion of the bilateral shoulders, elbows, wrists, hips, knees, and ankles were within functional limits.  There was no instability appreciated. . . . Manual muscle testing revealed full strength to all four limbs with the exception of left knee extension, which was decreased.

Pl.'s Mot. Ex. 2, at 3.    After examining Plaintiff, Leta Watts, a Certified Family Nurse Practitioner (CFNP), prescribed tramadol for pain and directed Plaintiff to continue treatment with her Chiropractor.  *Id.* at 3–4.  After a follow-up visit in March, Plaintiff had a third

appointment with Michigan Spine & Pain in May 2007.  At that time, Plaintiff indicated that her pain was better and that "medical massage is helping."  *Id*. at 12.

Plaintiff continued to receive treatments from Dr. Denholm with numerous appointments from March 2008 through 2010.  Plaintiff claims her injuries were aggravated on December 2, 2009 when she attempted to lift a bucket of water from under her sink.  Pl.'s Mot. 8.  Plaintiff visited Dr. Denholm that same day.  He concluded she was disabled due to her exacerbated injuries, that she could no longer perform her job duties, and authorized her absence from work between December 2, 2009 and January 4, 2010.  Admin. R. 187.  Plaintiff then followed up with Dr. Denholm three times in December and again on January 4, 2010.  Dr. Denholm noted that Plaintiff's problems had not changed, *id.* at 167–70, and signed another authorization for absence from January 4 until February 1, 2010, *id*. at 138.  Additional authorizations for Plaintiff's absence from work were signed on February 3 and March 1, 2010, extending Plaintiff's leave through May 2010.  *Id*. at 133, 136, and 137.

On May 17, 2010, Plaintiff filed a claim for long-term-disability benefits with Defendant. *Id*. at 63–71.  For her part, Plaintiff indicated she could no longer cook, babysit, lift objects, accomplish household chores, or drive.  *Id*. at 67.  She also disclosed that the source of her injury was the car accident in January 2006.  *Id*.

Dr. Denholm contributed to Plaintiff's benefits claim as well.  He established that she suffers from disc herniation and disc degeneration, and that he did not expect her to improve.  *Id*. at 63, 68.  When asked about restrictions and limitations, Dr. Denholm provided no specific responses.  Instead, he checked boxes to indicate that Plaintiff should never lift or carry more than ten pounds, should never push or pull anything, and should never climb, twist, bend, stoop, or reach above shoulder level.  *Id*. at 68.

Shortly after receiving Plaintiff's benefits application, Defendant employee Diane Henley called Plaintiff to acquire information about the nature of her claim. During the call, Plaintiff confirmed that her injuries resulted when she was an "unbelted passenger involved in a rollover crash due to an ice storm." *Id.* at 279. Plaintiff told Ms. Henley that she received care from both Dr. Denholm and Michigan Spine & Pain in the months that followed the accident. *Id.* at 280.

According to Plaintiff, her pain "stayed ever since the accident, continuing pain that has been going on for the last 4 years." *Id.* Plaintiff discussed "subsequent 'injuries' or aggravations due to lifting and carrying at work." *Id.* According to Plaintiff, her "job changed a couple of months just prior to [date of disability], funding changed so there was no daycare available. Additional lifting and carrying and that made her job much more difficult." *Id.* at 280–81. Finally, Plaintiff indicated she had been terminated as of June 2, 2010, and at that point she had been off work for six months. *Id.* at 281.

Also important was the fact that Plaintiff admitted she was put under a new supervisor who recently delivered a very negative evaluation of her job performance. Plaintiff's "old supervisor that was there when the accident occurred used to accommodate [her]." *Id.* However, according to Plaintiff, her new supervisor was not so lenient.

Ms. Henley then contacted Plaintiff's most recent supervisor — Dory Branson. Ms. Branson confirmed that on December 2, 2009 (Plaintiff's last day of work and the day she allegedly aggravated her injuries lifting a bucket of water), Plaintiff received a negative performance review. *Id.* at 310. Ms. Branson elaborated:

> [The review] was negative b/c when [Plaintiff] didn't want to do portions of her job she would do whatever she could to either have someone else do that task or she just wouldn't do it. An example provided, was that [Plaintiff] didn't want to drive the Bus – part of the occupation included transportation of either mothers or mothers and babies and you have to have a CDL license. [Plaintiff] told her [supervisor] that she couldn't use the mirror because it made her dyslexic and that

she can't drive the bus b/c of her neck.  She said she would drive it if she had to but that it would make everything worse and she didn't feel that she could drive it. [Supervisor] stated that [Plaintiff] reported that she couldn't do other things like checks which would necessitate her going up or down stairs. . . . [Plaintiff] also was receiving the negative evaluation due to multiple occasions of missed work, unscheduled absences. . . . Prior to Dory, [Plaintiff] always had a 3 day weekend – but now, b/c they had more things going on Dory's scheduler put [Plaintiff] on for 2 Saturdays a month and [Plainiff] didn't feel that she should have to work on Saturday.  Dory stated that they gave [Plaintiff] the review and she left and went right to the doctor and didn't come back.

*Id*. at 310–11.

During the first half of 2010, Plaintiff also applied for Social Security Disability (SSD) benefits.  She was referred for a medical examination on June 15, 2010 with R. Scott Lazzara, MD.  Dr. Lazzara reported that Plaintiff's injuries "appear to be soft tissue" and noted "[h]er weight may be contributing to this as she is 263 pounds at 66"."  *Id*. at 565.  According to Dr. Lazzara, "[a]t this point, [Plaintiff's] long term prognosis appears fair.  She would be somewhat remediable with continued flexibility exercises and weight reduction.  She does not appear to require surgical intervention at this point."  *Id*.  Based on this examination — and Dr. Denholm's opinion that Plaintiff was disabled[2] — Plaintiff was granted SSD benefits on July 7, 2010.  Pl.'s Mot. Ex. 6, at 1–8.

Meanwhile, Ms. Henley continued to investigate Plaintiff's claims on behalf of Defendant.  She contacted both Dr. Denholm and Mr. Gertiser to discern if the two men were willing to certify that Plaintiff is disabled.  Dr. Denholm did, Mr. Gertiser did not.  He returned the form on June 29, 2010 indicating that Plaintiff is not disabled.  Admin. R. 315–16.

---

[2] As emphasized later, when determining whether a claimant is entitled to SSD benefits, the Commissioner of Social Security has adopted a rule requiring "special weight [to be] accorded opinions of the claimant's treating physician."  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003) (citing 20 CFR §§ 404.1527(d)(2), 416.927(d)(2) (2002)).  However, no such rule applies in the ERISA context: when making ERISA disability determinations, "plan administrators are not obliged to accord special deference to the opinions of treating physicians."  *Black & Decker*, 538 U.S. at 825.

Ms. Henley also had Plaintiff's medical records examined by three individuals to assess her claimed disability: a registered nurse and two board-certified physicians. All three disagreed with the restrictions Dr. Denholm had recommended.

The first to review Plaintiff's records was Patricia Edwards, a registered nurse and certified case manager. Ms. Edwards reported that Plaintiff's "chronic back, neck, and right lower extremity symptoms have not been of the severity to refer her to orthopedics for further evaluation, require narcotic pain medication use or diagnostic testing including Xrays or MRI's to be completed." *Id*. at 303. Ms. Edwards concluded that Dr. Denholm's restrictions and limitations "are not supported by the current submitted medical records." *Id*. Ms. Edwards recommended a discussion with Plaintiff "as the R&L's appear overly restrictive." *Id*.

Next, Tammy Lovette, MD reviewed Plaintiff's records on July 16, 2010. Dr. Lovette is board-certified in family medicine, and she reviewed the records to determine "whether the work restrictions are reasonably supported by the clinical data that is available for review." *Id*. at 626. Dr. Lovette opined, "given the medical information available, the data does not support the restrictions given." *Id*. at 628. According to Dr. Lovette, "[t]here is no evidence that [Plaintiff's] physical status has changed to a degree that would preclude her from performing the same activities she performed at the time she went out of work." *Id*. Dr. Lovette concluded, "[t]aken as a whole, there is no evidence that [Plaintiff] has physical or mental deficits that rise to an impairing level. There have been no findings that would indicate she has any significant risk with working and no evidence that she lacks the physical capacity or tolerance for working." *Id*.

Joseph Sentef, Jr., MD, MBA, then reviewed Plaintiff's records and Dr. Lovette's report. Dr. Sentef, who like Dr. Lovette is board-certified in family medicine, wrote:

> I concur with Dr. Lovette. At the time of disability there does not appear that anything has changed in [Plaintiff's] conditions. She was still undergoing chiropractic treatment. She was not on any significant pain medication other than Ibuprofen. She has had no change in medications during that time period. There was no referral to a neurosurgeon, orthopedist or pain management physician. There are no recent MRI or EMG or electrodiagnostic studies that would support any kind of disability. There does not appear to be any surgical issues present. . . . Looking at all of [Plaintiff's] diagnoses, both individually and collectively as a whole, it would appear that the claimant would be able to perform her job without any restrictions or limitations.

*Id*. at 633.

After receiving these reports, Ms. Henley contacted Plaintiff on July 23, 2010. She advised Plaintiff that "a nurse clinician and two physicians review[ed] the available medical data and they do not agree with the restrictions and limitations opined by . . . Dr. Denholm." *Id*. at 409. Ms. Henley then informed Plaintiff that because the physicians "reviewed the claim and do not support the restrictions and limitations," she was going to recommend a decision that Plaintiff was not disabled and no benefits be paid. *Id*. Of course, the parties had yet to be informed that Plaintiff's SSD benefits application was approved.

Shortly thereafter, Plaintiff received that approval. Pl.'s Mot. 9. Considering the Social Security Disability Insurance (SSDI) award, Defendant granted Plaintiff's long-term-disability benefits application "while the SSDI file was requested for review." Admin. R. 20. Analysis of the decision was completed in September 2010, and it was recommended that Plaintiff undergo an Independent Medical Examination before long-term-disability benefits were continued.

So, on November 1, 2010, Plaintiff was examined by Keith D. Rose, MD. Dr. Rose is the Medical Director at Northern Michigan Rehabilitation Specialists, P.C., a Fellow of the American Academy of Physical Medicine and Rehabilitation, and he is board-certified in

physical medicine and rehabilitation. *Id.* at 999. He authored a comprehensive, fourteen-page report after evaluating Plaintiff's condition.

Dr. Rose reported the following:

Based upon taking a comprehensive history, performing a thorough physical examination and review of the available medical record, it is my professional medical opinion that [Plaintiff] is capable of performing, on a full-time basis, <u>*Medium Work*</u> – exerting 20 to 50 pounds of force occasionally, and/or 10 to 25 pounds of force frequently, and/or greater than negligible up to 10 pounds of force constantly to move objects.

\*       \*       \*       \*       \*

[Plaintiff] has no known cardiac, pulmonary, skeletal or neurologic pathology to adequately account for her current functional status. The conclusion drawn: increased energy expenditure due to motor deconditioning/poor endurance and body habitus/morbid obesity. Consequently, she will need to address stretch, strengthening and endurance through a combination of home exercise and stretching, and worksite activity.

*Id.* at 997 (emphasis in original). Dr. Rose noted that Plaintiff, "late in the course of her examination, feign[ed] weakness of both distal upper limbs during Jamar Dynamometer testing." *Id.* Dr. Rose reached this conclusion because maximal effort on the Jamar Dynamometer to measure grip strength "should produce a Bell curve," whereas "submaximal effort produces a 'flatter' line or irregular peaks. Thus, the flatter the curve the more likely submaximal effort is occurring. Based upon the curves that were obtained today, [Plaintiff] exhibited submaximal effort despite strong encouragement." *Id.* Dr. Rose concluded, "Thus, in conjunction with the Waddell sign of distraction during evaluation of lumbar paraspinal musculature and multifidi, further increases the likelihood that [Plaintiff] attempted to manipulate this examiner." *Id.* at 998. According to Dr. Rose, Plaintiff's "description of her disability, functional losses and pain intensity are clearly inconsistent with the physical examination performed," and she "does not

- 9 -

suffer from an objective pathological condition that would preclude her from returning to full-time medium work." *Id*.

> Dr. Rose then addressed the limitations and restrictions determined by Dr. Denholm:

> As regards the restrictions provided by Dr. Denholm, given the medical evidence available, the data does not support his conclusions and/or recommendations. This provider-patient relationship seemingly enabled [Plaintiff] in her quest to avoid the physically demanding activities required by her job (Treatment Specialist II). Even now, there is no convincing evidence to support that [Plaintiff's] functional status has substantively changed/worsened to preclude her from performing full-time medium work, or those same activities [Plaintiff] performed at the time that she was terminated from her employment . . . on December 2nd, 2009. This is further supported by a lack of significant pain medication, neurosurgical consultation, orthopedic referral, physical or occupational therapy, therapeutic interventions (epidural injection) or any recent diagnostic evaluations (e.g. MRI, CT, electromyography, lumbar discography, myelogram, etc).

*Id*. Dr. Rose outlined five limitations — intended to last four weeks — to replace the restrictions and limitations established by Dr. Denholm. According to Dr. Rose, for four weeks Plaintiff was to (1) limit left upper extremity lifts and carries; (2) limit left upper extremity over-the-shoulder reaches and horizontal reaches; (3) avoid rotational bending; (4) have a sit-to-stand-to-sit option; and (5) refrain from lifting more than 50 pounds. *Id*. at 997. After the four-week period, Plaintiff would be free to return to unrestricted, medium level work.

> Upon reviewing Dr. Rose's report — and in conjunction with the opinions of Dr. Lovette, Dr. Sentef, Mr. Gertiser, and Ms. Edwards — Defendant determined that Plaintiff was not disabled and denied her claim for long-term-disability benefits.

> In a letter to Plaintiff dated December 13, 2010, Ms. Henley detailed Defendant's decision and the evidence supporting it. She wrote, "Long Term Disability benefit payments have not been approved beyond December 9, 2010 as the Independent Medical Examiner did not find that you would have medical restrictions and limitations after a brief 4 week period of time."

*Id*. at 1027.  Ms. Henley explained that two physicians who reviewed Plaintiff's medical records determined there was no evidence to support Dr. Denholm's restrictions.  When SSD benefits were awarded, however, the payment of benefits was authorized because Defendant affords "significant weight to their determination."  *Id*.

Ms. Henley indicated that Defendant then obtained a copy of Plaintiff's Social Security file for review.  Noting the discrepancy between the reviewing physicians and the SSD benefits determination, Defendant scheduled an Independent Medical Examination with Dr. Rose.  When Dr. Rose concluded that Plaintiff was "capable of safely returning to full time, meaningful, medium level work with temporary restrictions for 4 weeks," Defendant determined that Plaintiff is "[n]o longer disabled and entitled to ongoing benefits."  *Id*. at 1028, 1029.  Ms. Henley's letter indicated how Plaintiff could commence an appeal of the decision to deny ongoing long-term-disability benefits.  Plaintiff perfected such an appeal, which was denied on May 12, 2011.  She subsequently filed this lawsuit.

## II

The first order of business is determining which standard of review applies here.  Plaintiff believes the appropriate standard of review is arbitrary and capricious because "Defendant, the plan administrator, is vested with discretion to determine the terms and conditions of the plan and to make decisions regarding whether applicants have a long-term disability."  Pl.'s Mot. 11.  Defendant, on the other hand, "concedes that the standard of review is *de novo*."  Def.'s Mot. 8.

Typically, federal courts review the denial of ERISA benefits under a *de novo* standard of review "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  If a plan includes such discretionary authority, then a

more deferential "arbitrary and capricious" standard applies. *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir. 1996).

This is true in most states, as it was in Michigan until July 2007. However, as of July 1, 2007, the Michigan Office of Financial and Insurance Services (OFIS) prohibited insurance policies authorizing discretionary authority provisions that would implicate an arbitrary and capricious standard of review. Mich. Admin. Code R. 500.2201-02 (2012). The code provides:

> (b) [After July 1, 2007], an insurer shall not issue, advertise, or deliver to any person in this state a policy, contract, rider, indorsement, certificate, or similar contract document that contains a discretionary clause. This does not apply to a contract document in use before that date, but does apply to any such document revised in any respect on or after that date.

> (c) [After July 1, 2007], a discretionary clause issued or delivered to any person in this state in a policy, contract, rider, indorsement, certificate, or similar contract document is void and of no effect. This does not apply to contract documents in use before that date, but does apply to any such document revised in any respect on or after that date.

*Id*. at R. 500.2202. Discretionary clauses either provide for a standard of review on appeal that gives deference to the original claim decision, *id*. at R. 500.2201(c)(vi), or provide for a standard of review on appeal other than *de novo* review, *id*. at R. 500.2201(c)(vii). The Michigan code prohibits these clauses in any policy, contract, rider, indorsement, certificate, or similar contract that is issued or revised after July 1, 2007. *Id*. at R. 500.2202(b)–(c).

Under its express preemption clause, ERISA "supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). But ERISA contains a savings provision: "nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities." § 1144(b)(2)(A).

- 12 -

In *American Council of Life Insurers v. Ross*, 558 F.3d 600 (6th Cir. 2009), the Sixth Circuit considered the interplay between ERISA and the Michigan rules outlined above. The plaintiff, American Counsel of Life Insurers, filed suit against defendant Ken Ross, the Commissioner of OFIS. The plaintiff claimed that the Michigan code is preempted by ERISA because it interferes with the statute's objectives, and that the rules do not fall within the ambit of ERISA's savings clause. *Id*. at 603. Squarely addressing the present issue, the court determined that the "Michigan rules fall within the ambit of ERISA's savings clause and are not preempted by that statute." *Id*. at 609. In other words, the court declared that ERISA plans in Michigan are subject to Michigan's rules. *Id*. Therefore, any ERISA plans issued or amended after July 1, 2007 require "*de novo* review of denials of ERISA benefits within Michigan." *Gray v. Mut. of Omaha Life Ins. Co.*, No. 11-15016, 2012 WL 2995469, at *3 (E.D. Mich. July 23, 2012).

The Plan here is governed by ERISA. The record establishes that the Plan was amended on September 22, 2009. Admin. R. 209. Because the Plan was amended after July 1, 2007 and distributed to Plaintiff, who lives in Michigan, it is governed by Michigan's Rule 500.2202. The fact that the discretionary language included in the Plan has been in place since 1996 is, of course, of no consequence. Accordingly, the *de novo* standard of review applies.[3] *See Pierzynski v. Liberty Life Assur. Co. of Boston*, No. 10-14369, 2012 WL 3248238, at *4 (E.D. Mich. Aug. 8, 2012).

---

[3] In her response to Defendant's motion, Plaintiff indicates that "[i]f the Court finds that the standard of review is now suddenly *de novo*, then Plaintiff demands to amend all of her pleadings." Pl.'s Resp. 8, ECF No. 22. But *de novo* review is no surprise trap sprung on Plaintiff or her counsel. Indeed, it is the standard of review most plaintiffs seek. Further, the Court never indicated review would be under any other standard, and *Ross* was decided in 2009, providing ample opportunity for review of its principles.

As to Plaintiff's demand that she be allowed to amend her pleadings, her time for amending as a matter of course has long since passed. *See* Fed. R. Civ. P. 15(a)(1). This Court will not grant leave to otherwise amend at this point. Plaintiff presented evidence and made her arguments attacking the more deferential arbitrary and capricious standard — there should be no need for alternate evidence or arguments under the less-accommodating *de novo* review.

When a court reviews a denial of ERISA benefits *de novo*, it is simply required to determine "whether or not it agrees with the decision under review." *Perry v. Simplicity Engineering, a Div. of Lukens Gen. Indus., Inc.*, 900 F.2d 963, 966 (6th Cir. 1990). The role of the reviewing court "is to determine whether the administrator or fiduciary made a correct decision." *Id.* The administrator's decision is accorded "no deference or presumption of correctness." *Hoover v. Provident Life and Acc. Ins. Co.*, 290 F.3d 801, 809 (6th Cir. 2002). This Court's review "is limited to the record before the administrator" in order to "determine whether the administrator properly interpreted the plan and whether the insured was entitled to benefits under the plan." *Id.*

### III

Based on the evidence underlying Plaintiff's claim, Defendant made the correct decision when it denied Plaintiff's claim for ongoing long-term-disability benefits. Accordingly, that determination will be affirmed.

### A

In denying Plaintiff's claim for benefits, Defendant relied upon the file reviews of Ms. Edwards, Dr. Lovette, and Dr. Sentef, along with the independent medical examination of Dr. Rose and the opinion of Mr. Gertiser. As a result, the opinions, limitations, and restrictions outlined by Dr. Denholm were discredited. This, as explained below, was wholly appropriate.

Generally speaking, a plan administrator cannot summarily reject the opinions of a beneficiary's treating physician, "but must instead give reasons for adopting an alternative opinion." *Curry v. Eaton Corp.*, 400 F. App'x 51, 59 (6th Cir. 2010) (citing *Elliott v. Metro. Life Ins.*, 473 F.3d 613, 620 (6th Cir. 2006)). Giving greater weight to a non-treating physician's opinion for no apparent reason lends force to the conclusion that a plan administrator's decision was incorrect. *Curry*, 400 F. App'x at 59 (citing *Elliott*, 473 F.3d at 620). Plan administrators,

- 14 -

however, "are not obliged to accord special deference to the opinions of treating physicians." *Curry*, 400 F. App'x at 59 (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003)).  Though ERISA requires " 'full and fair' assessment of claims and clear communication to the claimant of the 'specific reasons' for benefit denials . . . these measures do not command plan administrators to credit the opinions of treating physicians over other evidence relevant to the claimant's medical condition."  *Curry*, 400 F. App'x at 59 (quoting *Black & Decker*, 538 U.S. at 825).  Indeed, "a lack of objective medical evidence upon which to base a treating physician's opinion has been held sufficient reason for an administrator's choice not to credit that opinion."  *Curry*, 400 F. App'x at 59 (citing *Boone v. Liberty Life Assur. Co. of Boston*, 161 F. App'x. 469, 473 (6th Cir. 2005)); *see also Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 616 (6th Cir. 1998).

In sum, Defendant is not entitled to simply ignore the opinions provided by Dr. Denholm, "but it can resolve conflicts between those opinions and the opinions of its own file reviewers if it provides reasons — including a lack of objective evidence — for adopting the alternative opinions that are consistent with its responsibility to provide a full and fair review of [Plaintiff's] claim."  *Curry*, 400 F. App'x at 60.

A full and fair review is just what Plaintiff received, and it led to the determination that she is not disabled.  Dr. Denholm recommended various restrictions and limitations for Plaintiff after she allegedly exacerbated her injuries while attempting to lift a bucket of water.  But regardless of the circumstances surrounding Plaintiff's injury, the medical evidence does not support Dr. Denholm's opinion that she became disabled on December 2, 2009.  The lack of evidence was emphasized by Ms. Edwards, Dr. Lovette, Dr. Sentef, and Dr. Rose — all four

medical professionals that reviewed Plaintiff's records and Dr. Denholm's recommended restrictions.

Ms. Edwards noted that after Plaintiff exacerbated her injuries to the point she could not work, there was no referral "to orthopedics for further evaluation," no prescriptions for "narcotic pain medication," and no requests for "Xrays or MRI's to be completed."  Admin. R. 303.  Ms. Edwards expressly indicated that Dr. Denholm's restrictions and limitations "are not supported by the current submitted medical records."  *Id*.

Dr. Lovette's review is more of the same.  She wrote,

> It is unclear what prompted [Plaintiff] to go out of work in December 2009.  Her chiropractor has not referred her for a more specialized evaluation.  There are no treatment notes by a medical doctor pertaining to her back pain . . . .  The only imaging study related to her complaints is a lumbar MRI performed in 2007 which showed degenerative type changes.  There are no physical exams documenting neuromuscular deficits.

*Id*. at 628.  Dr. Lovette concluded, "given the medical information available, the data does not support the restrictions given above.  There is no evidence that [Plaintiff's] physical status has changed to a degree that would preclude her from performing the same activities she performed at the time she went out of work."  *Id*.

Dr. Sentef concurred.  He indicated that Plaintiff's alleged injury in December 2009 did not correlate with any changes in her physical condition.  She received no prescription for pain medication; there were no referrals to a neurosurgeon, orthopedist, or pain management physician; and no MRIs, EMGs, or electrodiagnostic studies were ordered to diagnose the problem.  *Id*. at 633.  According to Dr. Sentef, "Looking at all of [Plaintiff's] diagnoses, both individually and collectively as a whole, it would appear that the claimant would be able to perform her job without any restrictions or limitations."  *Id*.

- 16 -

Finally, after Plaintiff was awarded SSD benefits, Defendant sent her for a physical examination given the discrepancies between the three file reviewers and the SSD determination. Dr. Rose assessed Plaintiff in November 2010, and his thorough report aligned exactly with the three medical professionals that contradicted Dr. Denholm's restrictions.

Dr. Rose opined that a "[c]omprehensive evaluation of both medical and nonmedical evidence reveals that [Plaintiff's] reports of pain and consequent functional limitations are not substantiated." *Id*. at 998. Dr. Rose gave examples, such as the following:

> [Plaintiff], with little effort, was <u>easily</u> able to move from a seated position, on the carpeted examination room floor, with hands behind her head, to kneeling without the use of her hands without reporting any lower back, neck or shoulder pain. . . . Interestingly, at no time, did [Plaintiff] report any pain during the performance of this maneuver. If clinically significant/relevant left shoulder, lower back or neck pathology truly existed, a consequent substantive exacerbation of pain, leading to the discontinuation of the activity, would have been obvious.

*Id*. (emphasis in original).

Plaintiff's inconsistency is especially notable when comparing her claim form and Dr. Rose's records. On her claim form, dated May 17, 2010, Plaintiff indicated that as a result of her injuries, she could not "do household chores, cooking, babysitting, lifting or driving." *Id*. at 67. Then, while being evaluated by Dr. Rose on November 1, 2010, Plaintiff indicated she was "functionally independent in all activities of daily living (ADLs) and the operation of a motorized vehicle (2004 Chevrolet Impala)." *Id*. at 988. She also reported her ability to cook breakfast and dinner; do laundry; clean, dust, and vacuum her home; wash windows; and go shopping twice a week. *Id*.

Based on all of this evidence, Defendant relied upon Dr. Rose and his conclusion that Plaintiff "does not suffer from an objective pathological condition that would preclude her from returning to full-time medium work."[4] *Id*. at 998.

In line with its responsibility to provide a full and fair assessment with clear communication of the specific reasons for benefit denials, *see Curry*, 400 F. App'x at 59, Defendant specified why Plaintiff's benefits application was rejected. On December 13, 2010, Defendant sent Plaintiff a six-page letter outlining the decision to deny her benefits claim. The letter emphasized the following to support Defendant's determination:

- The completed physician review did not support the restrictions Dr. Denholm had provided and noted there was no evidence Plaintiff's physical status had changed to a degree that would prevent Plaintiff from performing her occupational duties at the time she claimed her disability began.
- The second physician reviewer agreed with the first review and found no changes in Plaintiff's levels of functioning at the time she stopped working. There was similarly no change in medication or referrals to specialists that may be indicative of a worsening in Plaintiff's levels of functionality.
- In order to afford significant weight to the Social Security Disability benefits determination that Plaintiff was eligible for disability benefits, Defendant began the payment of benefits to Plaintiff while it obtained a copy of the file for review.
- Because Defendant's file review and the Social Security Administration review led to different results, Defendant requested an Independent Medical Examination, where Dr. Rose found Plaintiff was "capable of safely returning to full time, meaningful, medium level work with temporary restrictions for 4 weeks.
- A vocational consultant concluded that Plaintiff could return to her regular, pre-disability occupational duties after the 4 week restriction period.

---

[4] Plaintiff makes the argument that her job actually consists of heavy work, not medium, because the job description "is *heavy* work." Pl.'s Resp. 16 (emphasis in original). But this argument is contradicted by her report that she never actually lifted "more than 30 pounds at work." *Id*. at 9.

- Because the restrictions would only have been in place for a 4 week period and after that time Plaintiff could return to full time medium level work, Defendant determined Plaintiff was not disabled and entitled to ongoing benefits as of December 10, 2010.

*See id*. at 1027–28.   Defendant also outlined how it was possible for the Social Security Administration to come to an alternative conclusion based on the differences between SSD determinations and ERISA disability determinations.   *Id*. at 1028.   Defendant then indicated when Plaintiff's payments and coverage would end, and the steps she could follow to initiate an appeal.   *Id*. at 1029–31.   Defendant's thorough claims-review process resulted in a well-reasoned decision which will not be overturned.

**B**

Plaintiff raises a number of issues with Defendant's decision to deny her benefits claim. According to Plaintiff, Defendant ignored the evidence supporting her disability, reversed its own decision multiple times, conducted a biased independent medical examination, and could not overcome inherent conflicts of interest.   Each concern is addressed in turn.

**1**

According to Plaintiff, "Defendant inexplicably ignored the opinions, medical evidence, and diagnostic testing performed by Dr. Denholm, Mr. Gertiser, and Dr. Vincent Shultz."  Pl.'s Mot. 15.  However, this is not the case.

Defendant directly addressed the fact that it was not going to rely on Dr. Denholm's opinions: "We reviewed your claim and had our physician contact your certifying physician, Dr. Denholm"; "Since our physician disagreed with Dr. Denholm's medical opinion, another review was completed by a physician board certified in Family Medicine and in Occupational Medicine"; "The completed physician review did not support the restrictions Dr. Denholm had provided."  Admin. R. 1027.  Further, Dr. Rose dedicated an entire paragraph to outlining why

he disagreed with Dr. Denholm's opinions.  *Id*. at 998.   Noted above, ERISA requires " 'full and fair' assessment of claims and clear communication to the claimant of the 'specific reasons' for benefit denials."  *Curry*, 400 F. App'x at 59.  ERISA does not require that "plan administrators [] credit the opinions of treating physicians over other evidence relevant to the claimant's medical condition."  *Id*.  Defendant has satisfied these requirements: it had three physicians evaluate Plaintiff's medical records, explained why it did not agree with Plaintiff's treating physician, and discounted his restrictions in favor of those outlined by Dr. Rose.   Just as the Sixth Circuit requires.

Plaintiff also believes it was error for Defendant to ignore evidence collected by Mr. Gertiser, but again, this is not what occurred.  Defendant specifically contacted Mr. Gertiser and inquired if he was willing to certify that Plaintiff was disabled.  Mr. Gertiser responded that Plaintiff was not disabled.  *Id*. at 315.  Although Plaintiff attacks Defendant's form as "vague and confusing" and complains that "disabled" was not defined, Pl.'s Mot. 15, Plaintiff cannot escape the fact that Mr. Gertiser, a medical professional who ordered and reviewed x-rays of Plaintiff's shoulder and back, did not feel she was limited by any disability.  Further, the x-rays Mr. Gertiser ordered were referenced by both Dr. Rose and Dr. Lovette in their reports, not ignored by Defendant.

Nevertheless, Plaintiff persists.  She believes Defendant did not consider 2007 tests from Michigan Spine & Pain regarding her injuries, or consider the evidence from Dr. Shultz when determining she is not disabled.  But Dr. Shultz never provided an opinion as to whether Plaintiff was disabled.  The last time he evaluated Plaintiff was early 2007.  He cannot offer an opinion about whether she is disabled after her December 2009 injury; he never even addressed the issue in 2007.

Also contrary to Plaintiff's point, her previous tests were considered by the reviewing physicians; they simply did not alter the conclusion that she is not disabled. Dr. Lovette indicated that "[a]n MRI from 2007 showed lumbar spine degenerative changes." *Id.* at 626. She still found that Plaintiff was not disabled. Dr. Sentef wrote, "MRI of the lumbar spine was performed on June 7, 2007 which revealed a moderate broad based disc bulge at L3-4 . . . ." *Id.* at 631. He also found that Plaintiff was not disabled. Dr. Rose acknowledged his review of x-rays from 2006 along with MRIs and an EMG from early 2007. *Id.* at 995. He too concluded that Plaintiff is not disabled.

In summary, Plaintiff's medical records were properly evaluated. The only doctor Plaintiff offers who believes she is disabled is Dr. Denholm. No other medical professional has offered a consistent opinion. Instead, Dr. Denholm's opinions, limitations, and restrictions were directly contradicted by Ms. Edwards, Mr. Gertiser, Dr. Lovette, Dr. Sentef, and Dr. Rose. When every medical professional, save one, is of the opinion that an individual is not disabled, it is appropriate to discount the lone opinion if proper explanation is offered. *See Curry*, 400 F. App'x at 59. Defendant did just that.

**2**

Plaintiff next attempts to make much of the fact that her request for disability benefits was first granted, then reversed, then granted again, and then reversed for a final time. But based on the chronology of events, this is not entirely surprising.

Plaintiff's original benefits application was granted while Defendant inquired into the merits of her claim. After Ms. Edwards, Dr. Lovette, and Dr. Sentef reviewed Plaintiff's medical history and opined she was not disabled, her long-term-disability benefits claim was denied. Shortly thereafter, the Social Security Administration granted Plaintiff's SSD benefits

application.   In an attempt to credit this determination, Defendant again granted disability benefits while it gathered more information.   In the end, after Dr. Rose's thorough report, Defendant came to the final conclusion that Plaintiff is not disabled.   This series of events, although unusual, is not evidence supporting Plaintiff's contention that she is.

**3**

Plaintiff attacks Dr. Rose as biased against her because his report suggests "that he is quite skeptical of [Plaintiff's] physical limitations."   Pl.'s Mot. 19.   Dr. Rose made it quite clear that he suspected Plaintiff's claimed limitations were disingenuous.   This does not indicate bias on his part, it only suggests the evidence he recorded during testing did not correlate with Plaintiff's allegations of pain.   Plaintiff suggests that she lacks the knowledge necessary to "manipulate a grip strength evaluation."   Pl.'s Mot. 20.   But Plaintiff's knowledge concerning manipulating the test is irrelevant.   Dr. Rose never claimed Plaintiff knew exactly how to manipulate the test; just that based on her results, she did not put forth maximum effort.

Plaintiff also takes issue with the fact that Defendant did not investigate her claims that Dr. Rose was biased, and never sent Plaintiff for an additional independent medical examination. But Dr. Rose's conclusions are validated by the corresponding opinions of Dr. Lovette, Dr. Sentef, Ms. Edwards, and Mr. Gertiser.   Additionally, Dr. Lazzara, who conducted Plaintiff's independent medical examination after her request for SSD benefits, indicated the same.   When asked if Plaintiff's "statements about the intensity, persistence, and functionally limiting effects of the symptoms substantiated by the objective medical evidence alone" Dr. Lazzara responded, "No."   Admin. R. 573.

Applicable legal authority supports Defendant's reliance upon Dr. Rose.[5]  A "claims fiduciary may reasonably rely upon the determination of a physician engaged to review the claimant's medical records that the claimant is not disabled."  *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 293 (6th Cir. 2005) (citing *Schmidlkofer v. Directory Distributing Assoc., Inc.*, 107 F. App'x 631, 633–34 (6th Cir. 2004)).  Moreover, the Sixth Circuit has held that "conclusory allegations of bias with respect to a plan-chosen reviewer, without statistical evidence that the reviewer *consistently* opined the claimants were not disabled, could not permit a conclusion that relying on that reviewer's opinion was" unfounded.[6]  *Curry*, 400 F. App'x at 66 (emphasis in original) (citing *Kalish v. Liberty Mut/Liberty Life Assur. Co. of Boston*, 419 F.3d 501, 508 (6th Cir. 2005)).  Plaintiff's allegations of bias on the part of Dr. Rose are not enough to tip the balance of the overwhelming evidence that she is not disabled.

**4**

Plaintiff suggests, based on her evaluation of Dr. Rose's work, that the vocational expert was asked to rely upon a biased IME.  But Dr. Rose simply evaluated the evidence to conclude that Plaintiff was not disabled, and applied 4-week restrictions.  It was appropriate for the vocational expert to consider those restrictions when determining Plaintiff's working ability because those were the restrictions Defendant concluded were applicable.  As Defendant points out in its response to Plaintiff's motion, "Plaintiff never offered . . . a vocational assessment of her own."  Def.'s Resp. 8.

---

[5] Cutting against Plaintiff's argument that Dr. Rose was biased, the Supreme Court has said that a patient's treating physician may be biased too, and exhibit an incentive to make a finding of "disabled."  *Curry* 400 F. App'x at 66 (citing *Black & Decker*, 538 U.S. at 832).

[6] Although *Curry* dealt with the application of arbitrary and capricious review, the Court finds no reason this principle should not apply to *de novo* review as well.

**5**

Finally, Plaintiff advances two other issues in support of her claim that Defendant's determination should be reversed. She claims that Defendant has a conflict of interest (in saving over $278,000 by denying Plaintiff's benefits), and that Defendant benefitted from Plaintiff's social security benefits award.

To the first point, Plaintiff is correct that Defendant is authorized both to decide whether an employee is eligible for benefits and to pay those benefits, and this dual function creates an apparent conflict of interest. *See Glenn v. MetLife*, 461 F.3d 660, 666 (6th Cir. 2006). But the Court has reviewed the benefits decision *de novo*, and the medical evidence does not support Plaintiff's contention that she became disabled and could no longer perform her job on December 2, 2009.

Further, as explained in *Black & Decker*, 538 U.S. at 825, the rules governing SSD benefit claims and ERISA benefit claims are different. While Dr. Denholm's opinion garnered special treatment by the Social Security Administration (SSA), no such benefit was due while Defendant reviewed Plaintiff's ERISA claim. This is because an entitlement to SSD benefits is measured by a uniform set of federal standards, while a claim for benefits under an ERISA plan often turns on the interpretation of plan terms that differ from the criteria used by the SSA. *Whitaker v. Hartford Life and Accident Ins. Co.*, 404 F.3d 947, 949 (6th Cir. 2005), *see also Bass v. TRW Employee Welfare Benefits Trust*, 86 F. App'x 848, 851 (6th Cir. 2004) (An ERISA plan fiduciary, having the power to construe the terms of an ERISA plan, is not bound by what the SSA finds). So while Defendant would necessarily benefit from Plaintiff's SSD determination, by no means must Defendant conform to that decision.

Plaintiff claims "Defendant was looking for every reason not to grant [her] benefits, whether she was actually entitled to them or not. . . . Defendant failed to perform due diligence and investigation and instead searched for any reason whatsoever to deny Plaintiff benefits without any proper explanation." Pl.'s Mot. 24. But a *de novo* review of the record leads to a different answer. Defendant received Plaintiff's benefit application, had her 1,100 page file reviewed by a Registered Nurse and two board-certified physicians, and then provided an independent medical examination when the SSA found Plaintiff was disabled. To date, five individuals have opined that the medical evidence does not support Plaintiff's alleged disability (Dr. Rose, Dr. Lovette, Dr. Sentef, Ms. Edwards, and Mr. Gertiser), while only Dr. Denholm opined Plaintiff is disabled.[7]  The evidence supports Defendant's determination, and its conclusion that Plaintiff is not disabled will be affirmed.

## IV

Accordingly, it is **ORDERED** that Defendant's motion to affirm, ECF No. 19, is **GRANTED**.

It is further **ORDERED** that Plaintiff's motion to reverse, ECF No. 20, is **DENIED**.

It is further **ORDERED** that Plaintiff's complaint, ECF No. 1, is **DISMISSED** with prejudice.

Dated: March 26, 2013                             s/Thomas L. Ludington
                                                   THOMAS L. LUDINGTON
                                                   United States District Judge

---

[7] Even Dr. Denholm at one point opined Plaintiff would be able to return to work after her December 2009 injury.  As a part of Plaintiff's long-term-disability benefits claim, signed May 3, 2010, Dr. Denholm indicated Plaintiff "should be able to return to work" on June 3, 2010.  Admin. R. 130.

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 26, 2013.

s/Tracy A. Jacobs
TRACY A. JACOBS